May it please the court, my name is Lawrence Kay and I am here today representing the appellate Marai von Saher. I would like to reserve five minutes for rebuttal. The district court order below should be reversed because it erroneously relied solely on this court's decision in Deutsch, where a direct conflict with the war power of the United States and treaties and agreements resolving that war were involved. But there is no such conflict here. Section 354.3 does nothing more than extend the statute of limitations for a plaintiff to bring a garden variety claim for the recovery of Holocaust-era property in the hands of museums or galleries. Such claims for recovering Holocaust property have been legion in our courts, starting right after World War II with the Bernstein case, continuing with the Altman case that was recently before this court, and with all the other cases, many cases cited in our briefs. In extending the statute of limitation for these kinds of claims, California acted within the traditional competence of the states to enact statute of limitations legislation. As Your Honor pointed out during the last argument, this court in Alperin drew a distinction between garden variety claims for the recovery of property and the war objectives claims involved there and in Deutsch. If garden variety property claims are not constitutionally committed to the federal government, then reviving them cannot violate the war powers or foreign affairs doctrine. That section 354.3 deals only with powers traditionally left to the states rather than those reserved to the federal government, as did the statute in Deutsch, is underscored by the submission by the Attorney General of the State of California of an amicus brief in this case in support of Ms. von Sacher's appeal and the striking absence of the United States Executive. That the U.S. government agrees that this is not a function of federal power was recently acknowledged by Ambassador Kennedy. His remarks are in the record. He's in charge of Holocaust affairs at the Department of State. And in a speech in 2007 in Potsdam, he stated that, quote, there is no specific role for the federal government in the art restitution process. He observed that although the federal government urges those in possession of Nazi looted art to return the works to their rightful owners, there is no mechanism for achieving this objective and no penalty for failing to do so beyond the opprobrium of one's peers. And he went on to say the claimant always has the option of turning to the courts. In an attempt to divine a conflict with U.S. policy where none exists, the appellee for the first time on this appeal points to the fact that after World War II, the United States sent looted property found in Germany back to the countries of origin so the property could be returned to the original owners, the original victims. But this was nothing more than a pragmatic administrative process intended to ease the burdens on U.S. troops because of the impracticality of entertaining claims by citizen of the various countries involved. Well, didn't the Netherlands return the property to Stroganoff, and then he sold it to Norton Stein, the paintings? The paintings were in the possession of the Dutch National Collection because they had never been restituted after the war to Mrs. Monsanto's predecessor. And in 1966, the Dutch government sold the products to Mr. Stroganoff. To Stroganoff, is that his name? Stroganoff. Stroganoff, and Stroganoff sold the paintings to the Norton Simon Museum. Yes. So, it looks to me as if perhaps the American government had found the paintings at Goring's place after World War II, returned them to the Netherlands. The Netherlands went through its process and sold them to Stroganoff. And I think also that a claim was made there by Ms. Sayer, which was rejected, I think, through an appeal to the Hague or whatever. And now she's claiming again as the successor to Garnsticker, from which the art was, we can say, stolen because Garn didn't pay enough for it. But the original, but all of that has been resolved by the Netherlands, it seems to me. But where am I wrong in that, that the Netherlands hasn't resolved all this? With all due respect, Your Honor, in a couple of different ways. When the, all of the Goring works were returned to the Netherlands so that they could be restituted to the true owner, they were not. The responsibility of returning them to the true victim was part of the external restitution process. As our briefs explain, the restitution process was unfair, bureaucratic, and Mrs. Haudsticker never made a claim under the restitution process. There was no restitution to her or anyone else. The Dutch National Collection just kept all of the Goring works in their collection. In 2000, there was litigation beginning in the late 90s by Mrs. van Saer, which was an attempt to reopen the original restitution process in 1952. And the courts of the Netherlands said it was too late to do that. But then after the Washington Conference, the Netherlands adopted new restitution policies. It was through that restitution process that Mrs. van Saer recovered all of the 200 Goring works still in the Netherlands, with the Minister of Culture stating that they had never been restituted to her before, they had been stolen by Goring, that Mrs. Haudsticker had never waived the claims, and they must all be returned to her. And I submit that if the chronics were still there in 2006, they too would have been returned with the other 200 works stolen by Goring. But they'd already been given to Stoddard or sold to Stoddard. Right, to Stroganoff. But from 1952 to 1966, they were in the Dutch collection, we say in the custody of the Dutch, not owned by the Dutch, and they had no right to sell it to Mr. Stroganoff. And they certainly didn't resolve any World War II claims. The restitution process in Holland ended in 1952 with no restitution proceeding regarding the Goring paintings or the chronics. All of this, I guess, would come up in the case in chief. That's one of my points, Your Honor, which you just made for me, is that this has nothing to do with the constitutionality of 354.3, and I should have said that earlier. Nothing at all that goes to the merits. And just because Your Honor raised it, we are not challenging the sale to Stroganoff. We're saying that under Dutch law, no title was transferred to Mr. Stroganoff, and thus he had no title to transfer to Norton Simon. But that, as you say, Your Honor, is all for the merits. We will show that. We will show why Mrs. von Sacher is entitled to ownership. Let's get back to this appeal. Yeah. In any event, I think we just made the point that the reference by Norton Simon to external restitution has nothing to do with the policy that we're talking about today, which is the return of property stolen during the war to the original owner if it's in the possession of someone who shouldn't have it. And that's what the case is here. An external restitution, that administrative process that put the obligation on the country of origin to get it back, to get it back through any process to the original owner, has nothing to do with that. Indeed, it's consistent with it. They refer to the London Declaration. They refer to external restitution. All of these supported the U.S. goal then, which is the goal now, that any property stolen by the Nazis during World War II and not subsequently restituted should be restituted. That was the gravamen of the Washington principles, which the United States worked to accomplish. But as Ambassador Kennedy said, it's not a binding agreement. It's just an interest, and the United States has never chosen to adopt an express policy, to enter into a treaty or an executive agreement to deal with the issue. Rather, as Ambassador Kennedy says, what they urge people to do if these pictures are found in the U.S. in this jurisdiction is first try to resolve it amicably. And if you can't, you have no choice but to turn to the courts. And that external restitution, that administrative process that only lasted shortly after the war, has nothing to do with that, which just made claim by then-Chief Judge Mukasey in New York in the Portrait of Wally case where the Allies had recovered it and then restituted to the wrong person in Austria. Even though in that case the United States was actually involved in the restitution process and how then they didn't honor it, they approved it. But Judge Mukasey noted in allowing a claim by the original owner to go forward in that case brought by the United States, he said that Austria sought to return all improperly seized property or to otherwise use it for the victim's general benefit, does not deprive the court of jurisdiction over property that escaped such distribution. The cronies escaped any effort to restitute them as the U.S. said the Netherlands must do. There is no federal policy, no treaty, no agreement that implicates any conflict with Section 354.3. The U.S. position then and now is that property stolen by the Nazis must be returned to the true owner. We do that through the courts of the United States. The statute here does nothing more than provide a claimant like Mrs. von Sacher more time in which to bring her garden variety claim for the return of Holocaust-era property. And because of that, there should be no preemption, there's no defect, as there was no impediment to the lawsuit in the Alcorn case. It would be ironic, as the brief of one of our amici states, if Mrs. Altman in the Altman case could recover Holocaust-era loot against Austria or bring a case to do so. And Mrs. von Sacher, an American citizen, could not do so with respect to a private museum in California after the legislature unanimously adopted legislation in its traditional competence that said that she could. If the lower court ruling were repelled, it would be clearly irreconcilable with the Alcorn case and would create, would turn 60 years of litigation for the return of Holocaust-era assets into a redress for war crimes. But, Your Honors, those cases, as this court has said, and this statute, distinguished from any other statutes like the one in Deutsch that do deal with an attempt to create a new cause of action to redress war crimes, this statute does not. It simply does nothing more than extend the statute of limitations or revive claims for the recovery of Holocaust-era assets that happen to be in the hands of a museum or a gallery. And we submit, then, that without analysis, in a very short order, without the benefit of oral argument, which was canceled shortly before the decision was rendered, the court below did not consider all of these issues, did not consider Alcorn, did not do an analysis of 354.3 against 354.6, and thus made error which this court, we respectfully suggest, should reverse. Let me ask you just three questions, and I know you've covered them, but we'll keep them in one place. Does the complaint involve any wartime acts by any enemy of the United States? Absolutely not. The engravement of the complaint is against the acquisition of the pictures by the Norton Simon Museum in 1971. Is California acting within its traditional competence? Absolutely, Your Honor. The traditional competence of the states is to enact legislation, including retroactive legislation, regarding the statute of limitations for common law claims. All right. And is this statute's application based on the nature of a foreign policy regime? It has nothing to do with foreign policy, Your Honor. All right. If you don't have any further questions. Save some time. We'll save some time. Thank you very much. Thank you. Very good presentation. Thank you very much. May it please the Court, Fred Rowley, Jr., for the Norton Simon Art Foundation and the Norton Simon Museum of Art. I'd like to respond to a couple of points that my friend made in his opening presentation, the first being the notion that these are garden variety claims, and I believe that my friend was referring to the Alperin case. That case is very different from this case, Your Honor. In Alperin, the Court bracketed the very issue that is before the Court today, and that is whether a claim revival statute, a statute that revived otherwise stale claims, arising out of wartime injuries, impermissibly intrudes upon the foreign affairs power of the United States. That issue was not decided in Alperin, and that's the issue that's before the Court today. What is not before the Court is whether there are general laws of applicability that could be preempted, whether under a field preemption theory, as Judge Thompson discussed in the previous case, or under conflict preemption theory. This case centers on 354.3, a statute that is identical in all relevant respects to the statute that was invalidated in Deutsch. So it is Deutsch, not Alperin, that is controlling here. Indeed, this case involves the exact opposite factual scenario from Alperin, because in Alperin you only had common law claims and laws of general applicability, and the question whether those were preempted was the issue before the Court, whereas here you only have this statute. It's a narrow question, and it ought to be decided exactly the same way that Deutsch decided it. Now, my friend noted, or argued, I should say, that the statute merely extends the limitations period. Well, that argument was rejected in Deutsch, and it was rejected for precisely the same reason it ought to be rejected here, and that is the statute on its face and by its terms creates a new cause of action. The Deutsch court concluded that it created a new class of claims, and the language that does that is may bring a claim, same language in the statute. So it is not merely an extension of the limitations period. And on that note, the statute is not an exercise by California of its traditional authority, either in the statute of limitations realm or in the property realm, and Mr. Saltman in the last case explained well why. With respect to property rights, this statute is not about looting in general or stealing in general. It arises and only arises if there's a war-related injury. The statute specifically references the taking of artworks by the Nazis, the enemy of the United States in World War II, during the period when the Nazis were in power. There is parallel statutory language in the statute that was at issue in Deutsch 354.6. Those claims for slave labor also arose from a wartime injury there. It was the enslavement by the Nazis during the same time frame, 1929 to 1945, when the Nazis were in power. So there is no wartime injury. Here it's the looting by the Nazis of artworks, and in Deutsch it was slave labor at the hands of the Nazis. In both instances, no war-related injury, there's no claim. So this statute, the statute that is before the court, is inextricably related to and intertwined with the issue of war-related injuries, and therefore directly implicates and impinges upon the foreign relations power of the United States, which is what Deutsch focused on. It noted and it cited a long string of authorities that make clear that the foreign relations power of the United States, and this includes the power to make and resolve war, is exclusive to the federal government, and it also made clear that that power is dormant, as Judge Thompson noted. And you can characterize field preemption in a couple of ways. It could be dormant or it could be occupy the field preemption. The court doesn't need to decide between those because either of those applies here for reasons that I can explain. But the point is the federal government doesn't need to exercise any power at all. It doesn't need to do anything for the foreign affairs power to attach and to preempt any state effort to create its own war remedies. And there can be no question that that's what California has done here, not only from the face of the statute where it provides relief for harms that were suffered during the war, the looting by the Nazis of Holocaust art, but also in the legislative history where they say, where the California legislator indicated its intent to provide relief for thousands of Holocaust victims. That is the same purpose and the same intent that the Garamendi Court noted. In Garamendi, California took the position that all it was doing was enacting a consumer statute. It was an insurance statute, and that it had traditional insurance-related goals in enacting that statute. The court disagreed, and it focused on the fact that the statute was intended to help victims of a war, of a war in which the United States fought. That's precisely the same goal from the face of the statute and the legislative history that Congress had here, and it's constitutionally impermissible. War-related injuries and the remedies for those injuries are squarely within the power of the United States government, as Deutsch reasoned. Now, it's also important to note, with respect to Deutsch, that it isn't, as my friend suggested, a conflict case. It's clearly a field preemption case. You know that not only because of the language that Judge Reinhardt used, where he characterized foreign affairs doctrine as dormant foreign affairs preemption, and also the citation to Zscherning and the language from Zscherning where the court said, the implication of the general principle is that even in the absence of a treaty or federal statute, a state may violate the Constitution by establishing its own foreign policy. So Judge Reinhardt characterized the doctrine as dormant. But even under an approach that Judge Thompson suggested occupied the field, even if the court were to take that approach, it's clearly present here, because there was a resolution of World War II. At a very general level, at a high level, it's reflected in the treaties with Germany. And we know that that resolution included a resolution for restituted artworks, because the federal government adopted a policy on looted art that was recovered. And there's no dispute that that policy existed. It's in the plaintiff's complaint. They allege the policy of the Allied governments was to return property to the governments of their countries of origin so that it could be returned to their rightful owners from whom it had been stolen. Now, my friend on the other side suggested that that policy somehow had a condition attached to it, that somehow that policy only obtained if the foreign government or the ally actually restituted the property to its rightful owner. The federal government's policy I submit and the documents we submitted to the court shows was a little different. It was to return works of art to the country of origin so that they could return the property to its true owner. As a goal and certainly as an aspiration, the government wanted it to go to its rightful owner. The London Declaration contemplated that. But the federal policy and the United States policy wasn't conditioned on it. If you look at the Presidential Advisory Committee report that we submitted and that the plaintiffs cited in the trial court, the position of the federal government was slightly more nuanced. It says here, and I'm looking at page 12 of that report, none of the national historical commissions consulted by that commission who drafted the report reported having found evidence of inventories of assets received by their governments from the United States or of agreements with the United States to effect individual restitution. What does that mean? What it means is the federal government returned these artworks to the countries of origin and left it to them to figure out how to get it back to the individual owner. There was no qualification that they even provide for individual restitution, let alone individual restitution in a particular way. And nothing in that policy suggests that an American court could 40 years later collaterally attack proceedings that were convened by an allied government in accordance with its own laws. So the federal policy was to let the governments of origin, the countries of origin, handle restitution as they saw fit. Now, let me ask you this. Did that policy expire in 1948? Your Honor, I would, I don't think, I think that the federal government stopped external restitution in 1948, which I think is what you're referring to, Judge Pragerson. Sure. But that is not the end of the policy because it hasn't been countermanded. In evaluating this policy and thinking about what the government was trying to accomplish with this policy, it's important to think about the historical perspective. Why did the government adopt this policy and what was it trying to do? So we're near the end of World War II. It's clear in 1944 that the United States and the allies are going to prevail. Following the landings at Normandy, it looked like Germany was going to fold, and it became clear that American GIs and American forces were going to be finding these looted works of art because everybody knew that the Germans had ransacked Europe. Something needed to be done about it. So what did the federal government do? It appointed a special commission and it also, within the State Department, appaneled a special committee to look at this subject. What are we going to do with all the looted art we find? How do we preserve the monuments and the other valuable objects that the Nazis had either stolen or damaged? And they considered a wide range of options, including individual restitution, the return of stolen art directly to the individual owner. And they declined to adopt that option and went instead with the return of artworks to the country of origin, letting them handle it. Why? It isn't, as my friend suggested, just because it would have been practically difficult for the American Army, the occupying American Army, to return to try to find the true owners and try to resolve disputes between titles. It wasn't that. A policy judgment was made that the countries of origin were in the best position to try to get this artwork, get this property back to its individual owner. So what happens at the end of World War II? Well, you've got the occupying army in Western Europe, and the policy judgment is made that it's going to be restitution to the country of origin. That policy is approved by President Truman while he was at Potsdam, and it is issued as a directive to the United States troops under order of General Eisenhower. That's precisely how you would think the policy would be adopted, given the problem that they were trying to solve, which is how do you get this artwork back to the individual owners? And now I'm talking squarely about the conflict preemption side, of course, in case the court wants to think about the problem in that way, but that's precisely what happened here. These artworks, the chronics, were returned to the Dutch government by the United States Army. There they were held, and there were restitution proceedings convened. Now, the plaintiffs have alleged in the trial court, and they've argued before the Dutch government that those proceedings were unfair. This court doesn't need to wade into that, whether it was fair or unfair, and for purposes of deciding this case, it can assume that the proceedings were unfair. But the proceedings unquestionably touched on the Gehry works in the following respect. Keep in mind, these paintings were stolen by Gehry, and they were part of what folks commonly refer to as the Gehry collection. He had all this art, and it was returned, in this case, to the Dutch government. Why was it part of the proceedings in the 1950s? Because what the plaintiff decided to do was not to file a claim for those paintings. She decided to file a claim for other property. Now, that's not disputed, and she maintains that she did that for reasons that were unfair, that the proceedings in themselves were unfair. But as Judge Thompson noted, the Dutch court of appeal treated the Gehry works in the 1950s, those works including these paintings, as bound up with the restitution proceedings that she did set into motion. The Dutch court of appeal essentially reasoned that the claim could have been brought, that it should have been brought, and that it was time-barred. It's analogous in some respects to claim preclusion, where you can't split your claim and you can't, you know, you have to bring all claims that arise out of the same transaction and occurrence. That's the nature of its reason. So the Gehry works were bound up with the proceedings. But we don't dispute that she didn't file a claim. That's important to note. And the court doesn't need to resolve all that. The reality is there was a restitution proceeding. That proceeding was all that the U.S. government contemplated. That is exactly what the U.S. government thought would happen. And so any attempt to circumvent that proceeding, any attempt to collaterally attack that proceeding, is fundamentally inconsistent with U.S. policy. That's our conflict preemption argument. We think this case ought to be resolved under Deutsch on field preemption, whether by dormant field preemption or, as Judge Thompson suggested, in occupying the field preemption is another way of thinking about the problem. But in either respect, we don't think that you need to go into the conflict preemption argument. The district court didn't do that. And we think that Deutsch squarely controls the case. Let's suppose in some underground cave or something in Europe, paintings were discovered today or tomorrow, and were determined to be part of paintings that the Nazis had stolen. Sure. What would, and let's suppose the United States government was the one that discovered them, what would the government do with those paintings and pursuant to what law? So I just want to understand the hypothetical so that I can respond. So the idea is that there are paintings that are discovered today, just so that there's no statute of limitations issue. No problem. And they're discovered by the United States government in Germany? Well, somewhere. Okay. Somewhere in Europe, and they're found to have been stolen by the Germans from, let's say, France. Sure. So somebody brings a claim and tries to recover these paintings. No, no, no. The government's just got these paintings. What does the government do with them? If the federal government recovered paintings in Germany today, what would it do? I would assume that it would follow this policy. It's never been countermanded. This policy that expired in 1948? Now, the external restitution expired in 1948, but the policy itself just hasn't been countermanded in the sense that this is how the United States government decided to dispose of art that it recovered. This was its policy judgment. We're going to do it this way. We could have done it other ways, but we're going to do it this way. Okay. All right. But, you know, just to touch on something that I think, Judge Thompson, your hypothetical kind of touches on, you know, this case doesn't involve a live, non-stale claim brought under laws of general applicability. That's not before the court. This case rests on 354.3, a special statute that California enacted in order to provide its own war remedy.  And on that point, Deutsch is simply controlling. There's no basis that's been offered by my friend to distinguish the decision. And the statutory language tracks. It's directly on point we submit. If there are no further questions, the Foundation and the Museum submit. Thank you very much. Good argument. Any rebuttal? Your Honor, and this is all in our brief, so I won't bore you, but Section 354.6, an issue in Deutsch, and Section 354.3 are not both war reparations statutes. They may use similar language, but as the Court said in Cruz, the formal language isn't what's relevant. It's what the language does. If you look at the legislative history, which is in the record and referred to in our briefs, the purpose throughout the legislative history of 354.6 is to create a remedy to redress wartime crimes involving slave labor against the wrongdoers of their successors. Throughout the legislative history of 354.3, it states constantly the purpose, the sole purpose of the legislation is to extend the statute of limitations for the garden variety kinds of claims for the recovery of Holocaust-era property that were involved in Albury and nothing more. The fact that there may be some similar language doesn't mean that one does create a cause of action and the other does, too, when the legislative history makes clear it doesn't. Plus, if you read the statute, it only says that garden variety claims for the recovery of Holocaust-era property may be brought against museums and galleries. They had to limit the common law through the year 2010. It's a pure statute of limitations statute. It does nothing more. That's what the legislature pointed out. And in referring to Albury, they didn't reach that issue. That's the only reason they referred to it, so it has no bearing on the issue here. Also, to suggest that Deutsch was a field preemption case is just not accurately reflecting the opinion. I refer to the opinion. I believe it's at page 712. Although we agree that Section 354.6 violates the foreign affairs power, we base our holding on narrower considerations. We hold that Section 354.6 is impermissible because it intrudes on the federal government's exclusive power to make and resolve war, including the procedure for resolving war claims. And the Cruz case and many other cases cited in our brief, including Garamendi, state that it was a clear conflict case. But the fact is Section 354.3 doesn't seek to impose redress on war crimes. The fact that it's dealing with Holocaust-era property just raises the same exact considerations of Alcorn in applying the political question doctrine. Just because something deals with something that came out of World War II doesn't render it anywhere near the foreign policy of the United States. We mentioned some in our briefs, but there are cases on the national and state level that provide exemptions from income tax for people who recover, just like in this case, Holocaust-era art. There are education statutes that have been set up in various states, and on and on and on. They have nothing to do with the foreign affairs power of the United States. And we submit that even if you apply the sliding scale test, the fact of the matter is there is paramount state interest in extending statute of limitations. As the Court said in Alcorn, that's what states do. In Alcorn they said that's what courts do. Here it's that's what states do. And that's all this is about. Even if there was field preemption and churning were relevant, it wouldn't have any bearing on the outcome here, I respectfully submit, because the court in Garamendi in referring to Justice Harlan's concurring opinion in churning has led very little, as all the courts say, including this Court, of the churning case. It applies now maybe in a situation where the statute requires a direct attack on the essence of a foreign government, such as where there's a boycott or an embargo. This case comes nowhere near that. It doesn't even try to address wartime remedies. And I believe on the sliding scale, I'm not sure which way it goes far away, but it would be 100. It would be the end of the sliding scale in favor of state interest and zero on foreign policy interest. With respect to the comments that I'll call him my friend, too, since he called me his friend, but the fact that it was not a policy. It was a, whether you call it a policy, it was just a program. It was consistent with the London Declaration that said all of these transactions of Nazis must be voided. I'll read you from page 8 of the presidential report when it just says we just have to take all these assets and get them back to the countries and ask them to find the victim and give it back to them. But at the end of that, it says, in cases where assets are restituted in this matter, the recipient government bore the responsibility to locate the rightful owner and to restitute the property turned over to it by U.S. authorities. That is an obligation. That obligation was not in any way, shape, or form achieved after the war in the Netherlands. And, indeed, I have to correct my friend's statement. There was no restitution proceeding, and I said that in my opening remarks, that was brought by Desi Houtstikker with respect to the Goring Works. Because the process, as we allege, but as the Dutch government found in giving the property back in 2006 that was still there, she couldn't bring a restitution proceeding. It was too difficult a process. She couldn't do it, so they just took it into the national collection. There was no restitution proceeding that occurred, no restitution proceeding that gave restitution to anybody, and no restitution proceeding that we're attacking. The fact is the policies of the government of the Netherlands, of the United States of America, and of the state of California are all exactly the same. If loot taken by the Nazis was not restituted to the true owner after World War II, as the Washington principles suggest and persuade, it must be returned now. And the United States government, through Ambassador Kennedy, has said that the only way to do that in the United States, if you can't resolve it amicably, is to go to the court, bring a claim like the claim in Alperin. The courts are able to discern between common authority claims for the recovery of property and war claims like this court did in Alperin, and that's the only resolution. The only solution to a claim like that of Mrs. von Sacher or the plaintiffs in Alperin. But the fact is that this statute has nothing to do with the resolution of World War II, has nothing to do with trying to create a new cause of action to give redress. It just gives heirs of Holocaust victims like Mrs. von Sacher enough time to bring their claim to recover this property that should have never been stolen and should have been given back to them more than 60 years ago. The time has come for that to happen now. Have you folks gone before the court's mediators? In the Court of Appeals, Your Honor? Yeah, we have a mediator. Yeah, no, we have not. We haven't gone before the mediator, Your Honor. Very good one. Skilled people. We're in favor of resolving claims. There have been unsuccessful attempts to resolve this over many years, but we're here because we weren't able to do that. Well, you might call, check with your honorable colleague and see if there's an interest in that. If there is, you just let the clerk know and we can send you to the mediator and if both sides request the mediator service in San Francisco, they'll come down here. I'm in favor of that, Your Honor. I lecture all over the country on mediation and art-related disputes, but I'm only trying to be realistic that we've actually tried that many times, but perhaps this will be the right time. Well, you've tried it, huh? Right. All right. Well, there's another avenue there. All right. Thank you very much. This matter is submitted as are all cases on the court's calendar today and we'll recess until 9 a.m. tomorrow morning. All rise.
judges: Pregerson, Nelson, Thompson